**JIM GAUDIOSI, ATTORNEY AT LAW, PLLC**
15396 N. 83rd Ave., Ste. D-102
Peoria, AZ 85381
TELEPHONE (623) 777-4761
James R. Gaudiosi, State Bar # 031321
jimg@azbkpeoria.com

*Attorney for the Plaintiff*

### UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| JAMES R. GAUDIOSI, as Personal Representative of the Estate of Ronald Gerald Gaudiosi on behalf of the Estate of Ronald Gerald Gaudiosi; and JAMES R. GAUDIOSI personally as the heir to the Estate of Ronald Gerald Gaudiosi<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA and Does 1 through 10 Inclusive<br><br>Defendant. | Case No.<br><br>**VERIFIED COMPLAINT FOR PERSONAL INJURIES DUE TO MEDICAL NEGLIGENCE** |

James R. Gaudiosi (the "Plaintiff"), the legal administrator and the personal representative of the Estate of Ronald Gerald Gaudiosi (the "Estate") and as the sole and only heir to the Estate hereby brings this Complaint against the United States of America and Does 1 through 10 Inclusive (the "Defendant") for medical negligence, neglect, medical malpractice and wrongful death. James R. Gaudiosi has been appointed by the Arizona Superior Court as the Personal Representative of the Estate of Ronald Gerald Gaudiosi. The following Memorandum will state the basis for the Plaintiff's claim(s) against the Defendant.

/ / /

/ / /

1                                        **MEMORANDUM**

2  **I.**       **INTRODUCTION**

3      **A.**     **History of the Decedent**

4        Ronald Gerald Gaudiosi ("Ronald") was born on February 20, 1950. At the age of

5 seventeen, Ronald voluntarily enlisted in the United States Marine Corps to serve his country in

6 Vietnam. Upon his return home from Vietnam, Ronald was honorably discharged and found

7 employment at the United States Postal Service ("USPS"). Ronald worked at the USPS for over

8 thirty years as a postal clerk and manager. Ronald received numerous awards for his outstanding

9 work performance while working as both a postal clerk and manager. Ronald retired from the

10 Postal Service with over two years of accumulated sick leave since he rarely if ever took time off

11 from work due to illness. Within a few years of retirement, Ronald began to lose the use of his legs

12 and was eventually confined to a wheelchair. About the same time, Ronald began having difficulty

13 eating and experiencing severe stomach pain, nausea, diarrhea and severe pain after consuming

14 food.

15        The death of our nation's Veterans is inevitable. However, the death of Ronald

16 *could have and should have been prevented*. Ronald's service in the Marine Corps and Vietnam

17 was not by choice. Even though Ronald voluntarily enlisted in the Marine Corps, he received his

18 draft notice while in boot camp. Ronald would have been forced to serve either way. Ronald

19 endured "Agent Orange" while fighting in Vietnam. Upon his return home and for the majority of

20 his life, Ronald further endured Post Traumatic Stress Syndrome commonly known as PTSD.

21 Further still, Ronald suffered from severe emotional distress from the war and severe and

22 reoccurring flashbacks. Ronald's flashbacks were so severe, he would often be found "fighting the

23 enemy" while carrying guns and kitchen knives throughout his home frightening both his child

24 and wife. Ronald was a proud man who felt he could cope with these things on his own without

25 treatment. However, the truth is Ronald's death was caused by an understaffed, VA system run by

26 greed driven politicians and a manager who openly admits to requiring her subordinates to put

27 patients on wait lists so both she and other managers could receive government bonuses for

28 keeping patient wait times below industry standards by lying and manipulating VA records.

1    Ronald had only the Phoenix Veteran's Administration Healthcare System (the

2    "VA") for his healthcare insurance. Ronald was assigned to Priority Group 6 due to his military

3    service in the war in Vietnam.  During the nearly three-year period of Ronald's illness, Ronald

4    attempted to schedule appointments with the VA and his primary care physician, Sandhya S.

5    Reddy, M.D. ("Dr. Reddy"). Ronald was told continually that no appointments would be available

6    for six to nine months into the future. Ronald was unable to obtain an appointment with Dr. Reddy

7    and his health continued to decline. During the years 2012 and 2013, Ronald was taken by

8    emergency services on four separate occasions to John C. Lincoln hospital for emergency care due

9    to severe malnourishment caused by his inability to eat and digest food properly. Just three days

10   before Ronald's death, he made one last ditch effort to contact the VA.  Ronald pled for help with

11   the VA Staff person who answered the phone, but he was again told that no appointments were

12   available and that if he needed emergency services to go to the nearest emergency hospital.  Ronald

13   passed away on May 7, 2013, at the age of 63 due to complications arising from anemia,

14   hypokalemia, melena, pancreatitis, C-diff, and sepsis.

15   All the while Ronald was sick, he continued to believe the VA and Dr. Reddy would

16   not let him down and would eventually schedule him for an appointment so they would see just

17   how ill he was and in need of serious medical help.  He believed that once he could be seen by Dr.

18   Reddy she would take the steps necessary to fully resolve and cure his C-diff and manage his

19   pancreatitis.  Unfortunately, he was not able to obtain that much needed appointment with Dr.

20   Reddy or anyone else at the VA to help him when he needed it most.

21   Ronald was a fun, energetic man who lived life to the fullest.  He was very proud

22   of his service in the Marine Corps. Ronald loved football, bowling, golf, and his friends and family.

23   Ronald had only one child, James R. Gaudiosi. Ronald was a proud member of the Veterans of

24   Foreign Wars and the American Legion. In his younger days, Ronald was a Golden Gloves boxer

25   and was always proud of his ability to stay physically fit. Ronald did not have any major health

26   issues during his life until 2011 when he began experiencing the symptoms that would eventually

27   lead to his demise. Because of Ronald's ability to stay in good shape, the onset of the symptoms

28   he began experiencing came as quite a surprise to him. Even though Ronald kept optimistic about

1  his recovery all during the time he was ill, he was not able to defeat the infection in his body.

2  While Ronald was experiencing difficulty obtaining treatment from the VA, he began to overly

3  self-medicate further exacerbating his symptoms.  Now that the truth has come to light regarding

4  the VA's problems including understaffing, the wait lists, lack of patient care, and the death of

5  numerous veterans who succumbed to the VA's inability to properly treat them, the Plaintiff prays

6  for the Court to make a difference in this Veteran's case by not allowing the VA to continue on

7  with treating patients in this manner.

8  **II.     COMPLAINT AGAINST SANDHYA S. REDDY, M.D.**

9         Plaintiff, James R. Gaudiosi, alleges:

10        1.      This is an action arising under the Federal Tort Claims Act, 28 U.S.C.A. §§ 2671

11  et seq. The Federal District Court for the District of Arizona shall be vested with jurisdiction

12  pursuant to 28 U.S.C.A. § 1346(b).  This Complaint arises out of acts and/or omissions of

13  defendant, United States of America and Does 1 through 10 Inclusive, within the United States

14  District Court for the District of Arizona.

15        2.      On or before the date of this Complaint, and at all times mentioned, the doctors,

16  nurses, and employees of the Phoenix VA were employees and/or agents of the United States

17  Government and were acting within the scope of their employment while performing their duties.

18  Specifically, Sandhya S. Reddy, M.D. was Ronald's primary care physician ("PCP"), Joann G.

19  Ahlemeyer, NP, Michael B. Monte, DO, and Minerva F. Sacani, RN (hereinafter and collectively,

20  "VA Staff"), were doctors and nurses who were and are employees and/or agents of the VA and

21  the US Government at the time of and at all times during the allegations described herein and are

22  hereby fully incorporated into this Complaint.  While performing their duties as employees of the

23  United States Government, Dr. Reddy and the VA Staff members were all acting within the scope

24  of their employment. Further, members of Phoenix VA management ("Management") including

25  but not limited to Sharon Helman, the former Phoenix VA Health Care System Administrator,

26  positioned as having authority over Dr. Reddy and the VA Staff, as yet to be identified, were acting

27  within the scope of their employment in their capacity as Management and employees of the U.S.

28  government. Further still, there may be additional members of the VA Staff yet to be determined

that may or may not have spoken to or treated Ronald in a healthcare capacity and are hereby fully incorporated as Does 1 through 10 with reservation to include additional Does if necessary.  These employees and/or agents until known, if any, shall be considered included in the defined term "VA Staff" as used herein.

3.      Prior to his death, Ronald sought medical treatment and was provided medical care at the VA and at John C. Lincoln Hospital ("JCL") for his healthcare needs. The history of Ronald's medical care provided to him by the VA and JCL is explained in the paragraphs below:

A.      On or about November 2010, Ronald began feeling symptoms of stomach pain and weakness in his legs. Specifically, Ronald was experiencing neuropathy in his legs and feet. Ronald did not feel steady while walking and would often have to sit down or stop for breaks while walking long distance of more than twenty feet.  Ronald was also experiencing severe pain in his stomach when he tried to eat, as well as nausea, vomiting and diarrhea after eating.  On January 11, 2011, Ronald visited the VA complaining of stomach pain and his increasing inability to walk. Dr. Michael B. Monte saw Ronald. Dr. Monte was unable to diagnose Ronald with any condition for the stomach pain or weakness in his legs, and Ronald was released the same day with no medication or treatment. VA Records reported from Dr. Monte confirm Dr. Monte took x-rays of Ronald's abdomen, which showed no unusual circumstances, but he did not perform any further tests to determine the cause of Ronald's abdominal pain.

B.      On May 16, 2011, Ronald again visited the VA seeking treatment for numbness to his legs and for his continued and severe abdominal pain. Ronald believed eating had some effect on his abdomen pain as it intensified after consuming food. On several occasions, Ronald began eating a normal meal and was overcome with abdominal pain, nausea, vomiting and diarrhea. On May 26, 2011, VA Staff called Ronald by telephone to advise him that his lab reports showed that he was potassium and iron deficient. VA Records confirm VA Staff suggested Ronald take iron and potassium supplements and sit in the sun for 15-20 minutes per day. VA Staff again failed to make any diagnosis for the cause of his abdomen pain at that time.

C.      On July 20, 2011, VA Staff called Ronald to schedule a CT-Scan ("CT") of his abdomen. The VA Records offer no evidence that although VA Staff performed the CT

procedure, there was <u>never</u> a follow up appointment scheduled or call to Ronald regarding a diagnosis or his results regarding the abdomen pain. VA Staff negligently failed to diagnose Ronald with any ailment or provide him any relief for his abdomen pain. The VA Staff did diagnose Ronald as having two pinched nerves in his lower spine causing his increasing weakness in his lower extremities. The VA recommended major surgery to his back to repair the pinched nerves. To have the surgery, Ronald would be required to be flown to the VA center in San Diego, CA. Being on a fixed income, Ronald lacked the funds necessary to provide himself with a medical caregiver to care for him post-surgery. Aftercare was not a benefit Ronald was entitled to receive through the VA; therefore, he was forced to put off the surgery.

D.      From July 2011 through November 2011, Ronald continued to suffer increased stomach pain and increasing inability to consume food on a regular diet. During this same time period, Ronald repeatedly called the VA to schedule follow up appointments to find out why he was suffering with these conditions. During this time, Ronald began to lose a considerable amount of weight as he was unable to digest food properly and receive life sustaining vitamins and minerals.  On November 16, 2011, Ronald's friends took him to the VA emergency room ("ER") after he became disoriented and incapable of understanding his basic bodily faculties including, but not limited to, being unable to make coherent statements, the inability to walk without any assistance, and an inability to make a conscious decision about medical advice that he may need. Ronald was diagnosed as malnourished and lacking in electrolyte vitamins and minerals such as potassium typically used by the body to help it keep cognitive thought. VA Staff diagnosed Ronald with low potassium, administered an intravenous bag of fluids and potassium, and discharged him later that day. It should have been clear to VA Staff at this time that something was causing Ronald's low potassium (known as hypokalemia), which caused an electrolyte imbalance. At that time, Ronald's primary care physician (Dr. Reddy) should have investigated the root cause of his hypokalemia.  Ronald's primary care physician did not follow up or do any investigation into what caused the hypokalemia.

Beginning in November 2010, Ronald was at the onset of pancreatitis, which was the cause of his abdominal pain.  VA Staff failed to diagnose Ronald for pancreatitis

1   upon his admission to the ER on November 16, 2011, or at any time prior. Upon information and

2   belief, pancreatitis treatments have a very high rate of success, thus Ronald's pain could have been

3   alleviated if VA Staff had properly diagnosed him and offered treatment options. VA Staff had a

4   duty to properly diagnose, treat, and manage Ronald's condition. The VA and Dr. Reddy were

5   negligent in doing so which further caused Ronald to suffer with the pain of a severe illness as is

6   pancreatitis by failing to properly diagnose him or offer any follow up care or treatment.

7           E.      On November 30, 2011, Ronald visited the VA as a follow up appointment

8   to the November 16, 2011, appointment.  Ronald complained to Dr. Reddy and VA Staff that he

9   could not stand for long periods of time and suffered frequent lightheadedness. At the time of this

10  visit, Ronald weighed in at only ninety-five (95) pounds, although he weighed approximately one

11  hundred thirty (130) pounds just three months prior. This substantial loss in weight, thirty-five (35)

12  pounds over three months or approximately 27% of Ronald's total weight, should have at least

13  alarmed the VA Staff that Ronald's health was deteriorating rapidly and that there was something

14  wrong that needed to be addressed immediately. Dr. Reddy and the VA Staff again negligently

15  allowed Ronald to leave the VA without further diagnosis or treatment.

16          F.      On January 8, 2012, VA Staff called Ronald to advise him that his test

17  results were positive for hemocult, and that Ronald should schedule a colonoscopy. On January

18  9, 2012, Minerva F. Sacani, RN called Ronald by phone and left a voicemail. Neither Nurse Sacani

19  nor any other VA Staff made follow up calls after the voicemail. Ronald called the VA multiple

20  times to schedule the colonoscopy appointment, but was told he would have to wait several

21  months. It was during this time period that Ronald contracted C-diff. C-diff is diagnosed when

22  blood is found in the stools as a result of bacterium overgrowing and releasing toxins into the

23  intestine. When Ronald tested positive for hemocult, Dr. Reddy should have known of the

24  presence of the C-diff infection or at least had a duty to inquire further into Ronald's symptoms.

25  A competent physician should have known the presence of blood in the stools was an immediate

26  red flag of a serious medical condition and scheduled her patient for a battery of tests to determine

27  the cause as soon as possible. VA Staff and Dr. Reddy negligently failed to make this diagnosis.

28  Ronald had watery diarrhea on average eight (8) times per day. Due to the nature of the C-diff

infection combined with the pancreatitis, Ronald had a hard time eating. Once food entered Ronald's colon, he suffered from intense pain nausea, vomiting and diarrhea from the combination of C-diff and pancreatitis. Having both conditions simultaneously caused Ronald's extreme weight loss as he could not eat, or if he did eat, his body could not absorb the needed nutrients to sustain life. Dr. Reddy and VA Staff <u>failed</u> to take any additional effort to help Ronald with either of these treatable conditions.

G.     After suffering with C-diff and pancreatitis for months, Ronald lost even more weight and strength. On January 24, 2012, paramedics were called because Ronald's condition had deteriorated to the point he was unable to effectively communicate. After examining Ronald, the paramedics immediately decided that Ronald's condition was so severe that he needed to be transported to the ER. Ronald looked extremely malnourished and was again experiencing a lack of cognitive thought because his electrolytes were not properly functioning. Paramedics determined almost immediately upon sight of Ronald that he was in a serious state of medical distress and he must be transported to the nearest ER. The paramedics had a duty to transport the patient to the nearest ER, which was at JCL. Upon admission to the JCL hospital, Ronald was diagnosed with anemia, low potassium, electrolyte imbalance, and malnutrition. Ronald was confined to the intensive care unit for several days until he regained enough strength to function on his own. He was given fluids, potassium, iron and a blood transfusion until his status improved. Ronald was discharged on January 30, 2012. VA Staff and Dr. Reddy were notified of his admission to JCL, but they made no attempt to follow up with him even though they were aware of his present medical condition and state of health.  JCL had diagnosed Ronald with C-diff and pancreatitis as the source of his illness.

After being discharged, JCL advised Ronald to seek follow up care and treatment for C-diff and pancreatitis from his primary care physician at the VA.  JCL sent Ronald's medical records, diagnosis, and medical advice from his JCL doctor to the VA and Dr. Reddy so they would know Ronald's diagnoses and for his follow up care. Dr. Reddy and VA Staff failed to treat Ronald's condition. Ronald called the VA requesting an appointment with Dr. Reddy for follow up care, and he was denied an appointment.  Ronald was told each time he called that no

1    appointments were available for at least six to eight months before he could be seen by his doctor.

2    Further, upon learning from JCL of Ronald's diagnoses and medical condition, Dr. Reddy and the

3    VA took no action to follow up with Ronald to make sure he was properly treated for these

4    conditions. Dr. Reddy and VA staff owed Ronald a duty to provide him medical care and failed to

5    provide him any relief or the care he deserved and so desperately needed.

6              H.      Between January 30, 2012, and August 27, 2012, Ronald's pain from the C-

7    diff, pancreatitis, and inability to eat food worsened. Ronald had gone for over thirty (30) days

8    without eating much of anything because his stomach pain was so severe.   Ronald lost a

9    considerable amount of weight, and had constant and severe pain in his abdomen, nausea, vomiting

10   and diarrhea. On August 27, 2012, after Ronald could not secure an appointment at the VA, and

11   facing serious illness and possible death, Ronald's family was forced to call emergency services

12   when he became so ill that he could no longer care for himself. Ronald had again deteriorated into

13   a state of absent cognitive recognition, the inability to function on his own without help and severe

14   malnourishment. Paramedics came to Ronald's home again determined that Ronald's health was

15   seriously in jeopardy, and it was necessary for Ronald to be transported to the nearest emergency

16   room located at JCL. JCL ran labs, x-rays, endoscopy, and CT. Ronald was again diagnosed of

17   among other things, C-diff and pancreatitis. JCL prescribed Vancomycin, which is a powerful

18   antibiotic, used to fight C-diff. JCL again sent Ronald's records for the VA to follow up with him

19   and treat or manage these conditions. On September 5, 2012, Dr. Reddy approved the prescription

20   of Vancomycin. Nurse Bacani called Ronald and left a message on his phone letting him know the

21   prescription was approved. Although Dr. Reddy approved Ronald's prescription, no further follow

22   up care was provided.  Ronald needed his doctor to supervise his symptoms to make sure the C-

23   diff was completely cured and to manage his pain from the pancreatitis.  Dr. Reddy did nothing

24   more to treat or cure Ronald's diagnosed medical conditions. Dr. Reddy should have begun to see

25   a pattern of these symptoms, and she should have known that Ronald needed her to supervise his

26   treatment to make sure he would continue to improve. Dr. Reddy and the VA did not follow up

27   with Ronald to see that he remained free of the C-diff or manage his pain. Unfortunately, Ronald

28   did not improve and Ronald's C-diff and pancreatitis continued to worsen and he was unable to

regain his health.

I.    On September 21, 2012, Ronald relapsed and was admitted to JCL for the third time. Ronald attempted numerous times to secure an appointment with Dr. Reddy. These attempts were futile, and yet again, Ronald was forced to obtain emergency care from JCL.  Ronald was diagnosed with anemia, C-diff, pancreatitis and malnutrition. Ronald's inability to eat and hold down food combined with no follow up care from Dr. Reddy kept him from regaining his strength and caused further decline in his health. Doctors at JCL continued to give Ronald large doses of Vancomycin in an attempt to control the C-diff. Ronald was discharged from JCL on September 24, 2012. He was told at discharge that he was still positive for C-diff and to continue the Vancomycin treatment through his primary care physician (Dr. Reddy) at the VA.  Ronald continued his attempts to obtain follow up care from the VA only to be told there were no appointments available for several months. Being on a fixed income without health care insurance from any source other than the VA, Ronald could not go elsewhere for treatment.  The costs were mounting up from Ronald's emergency room visits with all of them being denied coverage by the VA.  Since the VA and Dr. Reddy would not provide treatment for Ronald and he could not afford to get treatment from doctors outside the VA, Ronald's health continued to decline.

J.    For the next several months, Ronald suffered greatly from C-diff, pancreatitis, inability to eat or hold down food, intense and severe abdomen pain, nausea, vomiting, and incontinence. During this time, he continued trying to obtain a follow up appointment with Dr. Reddy or any doctor at the VA. VA Staff told him each and every time that he would have to wait several months for an appointment. After being discharged from JCL with a serious infection still in his system, Ronald needed medical treatment from Dr. Reddy immediately following the discharge. He was unable to receive any care from VA Staff no matter how hard he tried.

K.    On January 9, 2013, Ronald was again admitted to the hospital at JCL after he was found unresponsive in his wheelchair. A friend found Ronald unresponsive in his wheelchair in the middle of a hallway in his home. Ronald was so weak his attempt to wheel himself to his bedroom caused him to lose consciousness after his blood pressure dropped to a near death level. In the months prior to Ronald being found unconscious in his wheelchair, Ronald was

1   in so much pain, he had eaten little to nothing in the in excess of forty (40) days. Ronald weighed

2   less 100 pounds at the time of this incident.

3                  Paramedics at the scene determined Ronald's blood pressure to be so low

4   that he was near death as he was rushed to the ER. At the time he was admitted, Ronald was

5   diagnosed with: anemia, hypokalemia, melena, pancreatitis, and sepsis. The VA and Dr. Reddy

6   were again notified of Ronald's admission to JCL. On January 10, 2013, Ronald was given an

7   upper intestinal endoscopy, which revealed esophagitis with gastritis most likely caused by severe

8   vomiting. Upon his entrance into the emergency room, doctors conducted a full examination.  The

9   presence of melena (a common term for blood found in stools) was a determinative sign that the

10   C-diff was still present in Ronald's lower intestine. On January 11, 2013, Ronald was again

11   diagnosed positive for C-diff. Further and for the first time, Ronald was diagnosed with sepsis, a

12   condition commonly found when an infection has entered the blood stream. Ronald's C-diff had

13   progressed to the point where the massive infection in his colon had begun to eat through the colon

14   walls and was entering his blood stream.  Without constant and close supervision and management,

15   Ronald's prognosis was bleak.

16                  L.      On January 16, 2013, Ronald was discharged from JCL.  At his discharge,

17   Ronald was told his discharge diagnosis was: C-diff, malnutrition, urinary retention, systemic

18   inflammatory response syndrome, COPD, esophagitis with gastritis, hyperthyroidism,

19   deconditioning, and sepsis. Ronald had lost a lot of weight and still could not eat much.  He was

20   prescribed: Levathyroxine, Omeprazole, Vancomycin, and Florastor.  Ronald was extremely weak,

21   malnourished, suffering from incontinence, and in extremely poor health.  Ronald was wheelchair

22   bound as he had completely lost the use of his legs by this point.  Ronald was so ill from stomach

23   pain and diarrhea that it forced him to stay in bed for the better part of each day. Ronald needed

24   help with all day to day tasks and necessities.  Ronald was in need of serious medical attention

25   from Dr. Reddy and was unable to get any help from her or the VA.

26                  On the same day he was discharged, Ronald went to the VA to request his

27   prescriptions.  Ronald waited for over four hours before being seen by Dr. Reddy.  This was the

28   one and only time Ronald saw Dr. Reddy since 2011 when his symptoms first became apparent.

Ronald was extremely weak from sitting in the waiting room for so long he could not hold himself up in his wheelchair during the examination.  As he was slumped over in his wheelchair, Dr. Reddy reviewed his records from JCL, and asked him a few questions about his stomach pain. Dr. Reddy sent Ronald home after only a ten-minute visit.   Nurse Bacani called him two days later to let him know his prescriptions were ready for pick up.  Being in this extremely severe physical condition and in need of continued hospitalization, Dr. Reddy should have known he needed a much more extensive examination than a ten-minute visit.  Dr. Reddy and the VA Staff failed to provide Ronald the adequate level of care he needed and deserved.

Ronald continued to suffer with multiple conditions including, but not limited to, C-diff, malnutrition, urinary retention, systemic inflammatory response syndrome, COPD, esophagitis with gastritis, hyperthyroidism, deconditioning, sepsis, and pancreatitis until May 7, 2013, when he was found dead in his bedroom.  On the last day Ronald's son saw his father, he picked Ronald up out of his wheel chair to put him in bed.  Ronald's son describes the feeling of Ronald as "nothing but skin and bones." "It was easy to pick him up as he had lost so much weight." Typically, a man of Ronald's age and stature would weigh between 130 to 150 pounds. Ronald weighed considerably less, likely under 90 pounds by the ease of picking him up. Ronald suffered for nearly three years with pancreatitis and an intestinal infection that caused him to become malnourished to the point he was starving himself.  Ronald eventually succumbed to the sepsis caused by the massive amount of infection in his body and extreme malnourishment.

Ronald's death occurred because Dr. Reddy failed to schedule regular appointments and hospitalization to treat the many diagnoses for which Ronald suffered from greatly. If Dr. Reddy had properly supervised and managed Ronald's various ailments, Ronald's life expectancy would have been significantly increased and his pain level would have decreased giving him a better quality of life.  Ronald could have lived for many additional years beyond the sixty-three he lived to before succumbing to C-diff and pancreatitis among other things. On his death certificate, Dr. Reddy listed the primary cause of death as COPD even though she knew he was suffering from all these other diagnosed conditions. Ronald's COPD was never a factor in his death. Ronald was not in any danger from COPD at any time during the two plus years he suffered

1  with C-diff and pancreatitis. Dr. Reddy was well aware of what was causing Ronald to be sick, yet
2  she still could not acknowledge it while signing his death certificate.

3      4.    In April, 2014, it was revealed to the public that for the last several years, certain
4  managers and employees at the Phoenix VA were putting patients on wait lists and even secret
5  wait lists in order to give the appearance to higher management that the Phoenix VA was meeting
6  or exceeding its goals regarding patient wait times.  These managers, employees and doctors while
7  working within the scope of their employment with the United States Government were using the
8  wait lists for the purpose of securing higher merit bonus money by exceeding employment
9  standards and the VA's goals set by higher management officials.

10      Ronald tried for over two years to make appointments for treatment at the VA and
11  was repeatedly told he would have to wait for up to as much as nine months for a single
12  appointment but never received one. On one occasion, Ronald was even told by VA Staff that there
13  were no appointments available and the only appointment he could get with Dr. Reddy would be
14  by phone because Dr. Reddy was, "just too busy to see him in person." Ronald's health care needs
15  were so severe that a phone appointment would not come close to helping him reduce his pain or
16  to provide a proper diagnosis or treatment. The VA and Dr. Reddy had a duty of care as Ronald's
17  only source of health care and as his primary care physician to treat Ronald for all his ailments to
18  the best of their ability.  The VA and Dr. Reddy failed to meet this duty of care and as a result,
19  Ronald passed away.

20  **II.**    <u>**COMPLAINT AGAINST THE VETERANS ADMINISTRATION**</u>

21      1. Plaintiff hereby incorporates by reference the allegations contained in the paragraphs above
22  as though fully set forth herein.

23      2.    Considering the allegations proposed in paragraphs 1 through 4 above, the Plaintiff hereby
24  states the action(s) taken or not taken by Dr. Reddy were within the scope of her employment with
25  the Veterans Administration ("VA").  Further, other employees of the VA who were assigned to
26  or know of Ronald's case added to or were equally responsible for the premature death of Ronald.
27  These employees of the VA were also acting within the scope of their duties as employees of the
28  VA and while employed at the VA as employees of the United States government.

3.     Further, Dr. Reddy, VA Staff, or VA Management put Ronald on wait lists or secret wait lists so as to give the perception that Ronald was being seen in a timely fashion.  This conduct was not only negligent it was willful. Sloan Gibson, former acting Secretary and former Secretary, Eric Shinseki, have admitted openly to Congress, on media and on the VA's own website that managers at the Phoenix VA were willfully and negligently using these wait lists for the purpose of "cooking the books" so they could receive higher merit bonuses. Even if Ronald was not put on a wait list, the VA purposefully failed to provide him with timely care, which ultimately caused him prolonged suffering until he died.

4.     In an article published on July 16, 2014 (cited on the VA's website, www.va.gov), the newly appointed acting Secretary of the Department of Veteran's Affairs, Sloan D. Gibson, after completing a preliminary investigation of the VA, listed six items in need of repair within the Veteran's Affairs healthcare system including but not limited to: getting Veterans off wait lists and into clinics; fix systemic scheduling problems; hold people accountable where willful misconduct or management negligence are documented; and quantify the resources needed to consistently deliver timely high-quality health care.  This article among others posted by not only the Department of Veteran's Affairs, but also various news sources, outline the willful misconduct and negligence perpetrated by employees at the Phoenix VA. The VA has repeatedly confirmed the validity of these allegations and promised to make things better for veterans everywhere, yet has done almost nothing even after Congress has passed several Acts overhauling the VA and appropriating money to turn around its dysfunctional system.

5.     The VA has done almost nothing to correct its willful and malicious treatment of America's veterans.  Ronald died because of the VA's willful conduct in denying him healthcare and an opportunity to be seen by any doctor.  Even if Dr. Reddy was overbooked, the VA should have given Ronald an opportunity to see another doctor or receive treatment somewhere else while under the VA's care. The VA must acknowledge the treatment the VA provided to Ronald was insufficient and caused his premature death.   The VA can do this now by admitting its responsibility in causing the death of Ronald Gaudiosi and agreeing to the demands made in this complaint.

III.   **LAW**

A.   **Negligence**

A negligence claim requires the plaintiff to establish, "(1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Gipson v. Kasey*, 150 P.3d. 228, 230 (2007). "Under Arizona law, an action founded upon negligence must be based upon a showing (1) that defendant has a duty to protect plaintiff from injury; (2) that defendant failed in that duty; and (3) that the failure proximately caused plaintiff's injury." *Cline v. United States*, 273 F.Supp. 890, 894 (D. Ariz., 1967). *Robertson et al. v. United States*, 382 F.2d 714, 9th Cir., Sept. 15, 1967; *Shafer v. Monte Mansfield Motors*, 91 Ariz. 331, 372 P.2d 333.

"Duty is defined as an 'obligation, recognized by law, which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm.'" *Gipson*, 150 P.3d 228, 229, 214 Ariz. 141, 496 Ariz. Adv. Rep. 41 (Ariz., 2007). *Citing Markowitz v. Ariz. Parks Bd*., 146 Ariz, 352, 354, 706 P.2d 364, 366 (1985) (*citing Onliveros*, 136 Ariz. At 504, 667 P.2d at 204). "The standard of care is defined as '[w]hat the defendant must do… or must not do… to satisfy the duty'" *Coburn v. City of Tucson*, 143 Ariz. 50, 52, 691 P.2d 1078, 1080.

The duty of care is breached when a defendant fails to act with "reasonable care under the circumstances." *Markowitz*, 146 Ariz., at 356, 706 P.2d at 368.  The duty is often analyzed within its foreseeability, which means whether "a duty of care…extends to potential victims [within] the zone of foreseeable risk." *Rossell v. Volkswagon of Am.*, 147 Ariz. 160, 164, 709 P.2d 517, 524 (1985). The question most often asked by the Courts is whether the defendant behaved as a person of "ordinary prudence" in the same or similar situation. *See Morris v. Ortiz*, 103 Ariz. 119,121,437 P.2d 652, 654 (1968).

Causation consists of two elements. The first is the "but for" test: "cause in fact exists if the defendant's act helped cause the final result and if the result would not have happened without the defendant's act." *Ontiveros v. Borak*, 136 Ariz. 500, 505, 667 P.2d 200, 205 (1983). Arizona

1    courts also look to whether the defendant's act or failure to act was a "substantial factor" in the

2    resulting injury to the Plaintiff. *See Thompson v. Sun City Community Hosp., Inc.*, 141 Ariz. 597,

3    606, 688 P.2d 605, 614 (1984).

4         Next is proximate cause. The definition of proximate cause as defined by the Arizona

5    Supreme Court is, "that which, in a natural and continuous sequence, unbroken by any efficient

6    intervening cause, produces injury, and without which the injury would not have occurred."

7    *McDowell v. Davis*, 104 Ariz. 69, 71, 448 P.2d 869, 871 (1968). Proximate cause is often

8    "determined upon mixed consideration of logic, common sense, policy and precedent." *Nichols v.*

9    *Phoenix*, 68 Ariz. 124, 136, 202 P.2d 201, 208 (1949).  Foreseeability of the plaintiff's injury is

10   generally the factor given the most weight. *Markowitz*, 146 Ariz. At 358, 706 P.2d at 370. Finally,

11   claims for negligence require damages. An outline for damages in this case is in Article III of this

12   Complaint *infra.*

13        In this case, Dr. Reddy, VA Staff and Management owed Ronald a duty of care under a

14   theory of Ronald's doctor patient relationship to provide him medical health care and to provide

15   him an appointment to see a doctor, or, specifically, an opportunity to see Dr. Reddy when needed

16   and in a timely fashion.  The defendant breached that duty when Dr. Reddy and the VA Staff told

17   Ronald that it would be months before he could be seen, if at all. On numerous occasions during

18   the years 2011 through 2013 before Ronald passed away, Ronald called Dr. Reddy requesting an

19   appointment and was told over and over again that there were no appointments available, or if

20   there were appointments available, the soonest appointment in which Ronald could be seen by Dr.

21   Reddy would be as much as nine months into the future. The VA Staff made no attempt to schedule

22   Ronald with any other doctor within the VA.

23        Ronald was forced to have paramedics take him to John C. Lincoln hospital in Phoenix,

24   Arizona for emergency services and life saving measures on four separate occasions while waiting

25   for an appointment with Dr. Reddy and the VA. Each time Ronald was admitted at JCL, not only

26   did staff at JCL contact the VA for Ronald's records and to notify the VA that Ronald had been

27   admitted, but also JCL forwarded Ronald's diagnoses to the VA for the VA and Dr. Reddy to

28   provide follow up care to Ronald.  The VA and Dr. Reddy took no action whatsoever. Neither the

1    VA nor did Dr. Reddy make any effort to call Ronald to schedule follow up care appointments

2    after any of the four times Ronald was admitted to JCL. Neither Dr. Reddy nor did the VA contact

3    Ronald to make sure his diagnoses were treated properly or to inquire if he needed further

4    treatment, tests, or hospitalization.

5            Dr. Reddy knew specifically each time Ronald was admitted at JCL because JCL contacted

6    Dr. Reddy's office to notify her of his admission.  Dr. Reddy breached her duty of care when she

7    failed to follow up with Ronald; when she failed to properly manage and treat each and every

8    diagnosis for which he was diagnosed at JCL; when she failed to even contact Ronald to inquire

9    as to whether or not his diagnosed ailments were being properly treated; and when she failed to

10   schedule Ronald for any timely appointments.  The VA breached its duty of care when it failed to

11   schedule an appointment for Ronald to see his physician. Ronald made call after call asking if not

12   begging for an appointment to see a doctor. Both the VA and Dr. Reddy knew or should have

13   known Ronald was in serious need of medical help and treatment.  Both the VA and Dr. Reddy

14   failed to provide him with any treatment, follow up care, and management of the diagnoses for

15   which he was in serious and drastic need of help to maintain, cure or prevent reoccurrence of his

16   C-diff, pancreatitis, malnourishment, incontinence, stomach and abdominal pain, sepsis, and

17   eventual death.

18           This conduct is what proximately and actually caused Ronald's death.  Actual cause is the

19   specific act or failure to act that with or without that action caused the injury also known as the

20   "but for test".  Here, but for Ronald's inability to be seen by Dr. Reddy and receive much-needed

21   healthcare did cause his C-diff, pancreatitis, and all the other diagnoses to go untreated or not

22   treated sufficiently as to cure or control these conditions. This lack of supervised treatment to

23   control Ronald's C-diff and lack of pain management did cause Ronald the inability to eat, hold

24   down food, and receive life sustaining nutrients into his body. The inaction by Dr. Reddy and the

25   VA staff further caused Ronald to become malnourished, and become septic. Once Ronald became

26   septic, it was only a matter of time before he would succumb to the infections raging in his body.

27   Ronald finally did surrender to these infections on May 7, 2013, when he passed away.

28           Had Ronald been able to be seen by Dr. Reddy, it is much more likely than not that Dr.

1   Reddy and VA Staff would have been able to cure the C-diff and control his pain from pancreatitis.

2   Further, had Ronald been able to be seen by Dr. Reddy, it is more likely than not that treatment

3   for the aforementioned conditions would have given Ronald the ability to eat, digest, and receive

4   nutrients from food.

5          Proximate cause is known as the "foreseeability test." This test determines whether the

6   result of the action or inaction taken was a foreseeable outcome. The fact that the VA would not

7   give Ronald an appointment within a timely manner is the proximate cause of Ronald's death.  It

8   is very foreseeable that by forcing Ronald to wait for months on end before being treated, and

9   forcing Ronald to call for emergency services only when he was in a life threatening situation

10  would cause death or at least create additional health problems possibly leading to death.

11         Here, Ronald made call after call to VA Staff and Dr. Reddy asking for an appointment.

12  Each and every time, Ronald was told he would have to wait months to be seen, if at all.  Being

13  forced to wait for an appointment caused Ronald to go into a state of emergency where he was

14  forced to call 911 and have emergency services take him to JCL for help on four separate occasions

15  within a two-year period.  The staff at JCL did what was necessary to help Ronald, but could only

16  do so much as an emergency facility.  JCL advised Ronald each time that his primary healthcare

17  was with the VA and that JCL would only treat Ronald until he was able to be seen or admitted to

18  the VA.

19         JCL made multiple requests to VA Staff to provide him with care as soon as possible by

20  scheduling follow up care, treatment, tests, and prescriptions.  JCL sent Ronald's records to VA

21  Staff each time he was admitted. Dr. Reddy and VA Staff did almost nothing to offer any health

22  care to Ronald even though they knew he was in need.  Therefore, Dr. Reddy and VA Staff knew

23  or should have known that Ronald was seriously in need of medical attention. Dr. Reddy and the

24  VA continued to schedule appointments for Ronald six, eight or even nine months into the future,

25  if they said any appointment would be available at all. At one point, VA staff told Ronald the only

26  appointment available to him would be by phone with Dr. Reddy. The VA and Dr. Reddy did

27  nothing to provide him health care, treatment or management of his diagnoses.  It is foreseeable

28  that by not providing a patient with serious medical conditions treatment for his diagnoses, he

would suffer and death would eventually occur.  In this case, Ronald was diagnosed with a laundry list of diagnosed conditions from JCL including, but not limited to: C-diff, malnutrition, urinary retention, systemic inflammatory response syndrome, COPD, esophagitis with gastritis, hyperthyroidism, deconditioning (malnourishment), and sepsis. As a patient of Dr. Reddy and the VA, it was foreseeable, or should have been foreseeable that by not treating or providing follow up care, tests, pain management, or continued management of these conditions that Ronald would eventually succumb to them and death would occur.

Ronald was damaged by the VA and Dr. Reddy by suffering a premature death. Had Ronald been able to be seen by Dr. Reddy or any VA doctor, Ronald foreseeably would have lived much longer.  His C-diff could have been cured, and his pancreatitis could have been managed. The other diagnoses for the most part would have been eliminated by just treating these two conditions. Ronald was a healthy individual, a former Marine who took pride in his physical condition.  He was fit, healthy and strong before succumbing to C-diff and pancreatitis. Ronald would have lived many more years had he simply been able to see a doctor and been supervised over his C-diff and received pain management.  Ronald's only son and friends were damaged by losing a beloved father, friend, and confidant.  Ronald was loved by many people who were all left wondering why and how the United States could treat one of its veterans who put his life on the line for this country in war-time combat in this most horrific manner.

**B.    Medical Malpractice**

"Medical malpractice claims in Arizona are governed by statute. *See* A.R.S. §§ 12–561, *et seq.* Pursuant to A.R.S. § 12–561(2): "Medical malpractice action" or "cause of action for medical malpractice" means an action for injury or death against a licensed health care provider based upon such provider's alleged negligence, misconduct, errors or omissions, or breach of contract in the rendering of health care, medical services, nursing services or other health-related services or for the rendering of such health care, medical services, nursing services or other health-related services, without express or implied consent including an action based upon the alleged negligence, misconduct, errors or omissions or breach of contract in collecting, processing or distributing whole human blood, blood components, plasma, blood fractions or blood derivatives."

1  *Nunsuch ex rel. Nunsuch v. U.S.*, 221 F.Supp.2d 1027, 1032 (2001). "No medical malpractice

2  action shall be brought against a licensed health care provider except upon the grounds set forth in

3  § 12–561." A.R.S. § 12–562(A). *Id.* "A plaintiff's burden of proof in a medical malpractice action

4  is prescribed by A.R.S. § 12–563, which provides: Both of the following shall be necessary

5  elements of proof that injury resulted from the failure of a health care provider to follow the

6  accepted standard of care:

7      1. The health care provider failed to exercise that degree of care, skill and learning expected

8  of a reasonable, prudent health care provider in the profession or class to which he belongs within

9  the state acting in the same or similar circumstances.

10      2. Such failure was a proximate cause of the injury. *Id.*

11      "In a medical negligence case, the "yardstick" by which a physician's or other healthcare

12  provider's compliance with his duty is measured is commonly referred to as the "standard of care."

13  *Mann v. U.S.* 2012 WL 273690, (2012), *citing*, *Seisinger,* 220 Ariz. at 94, 203 P.3d at 492. "A

14  plaintiff must prove negligence by presenting evidence that the healthcare provider fell below the

15  applicable standard of care and that the deviation from the standard of care proximately caused the

16  claimed injury." *Id. Citing*, *Ryan v. San Francisco Peaks Trucking Co., Inc.,* 228 Ariz. 42, 262

17  P.3d 863, 869–70 (Az.Ct.App.2011) (citing A.R.S. § 12–563); *Gregg v. Nat'l Med. Health Care

18  Servs., Inc.,* 145 Ariz. 51, 54, 699 P.2d 925, 928 (Az.Ct.App.1985).

19      In this case, the VA Staff including Dr. Reddy as Ronald's primary care physician failed

20  to exercise a degree of care, skill and learning to provide timely and accurate health care to Ronald.

21  Dr. Reddy and VA Staff knew Ronald was in need of medical care when he first went to the VA

22  in early 2011 for both stomach pain and a problem with his legs.  A VA doctor offered Ronald

23  back surgery to fix his leg problem, but the doctor and the rest of the VA Staff did almost nothing

24  to diagnose, cure or treat his stomach pain.  The VA doctor did run some tests to detect a problem,

25  but the test results were inconclusive. The VA and Dr. Reddy did not provide any further treatment,

26  tests, or medication to treat or diagnose Ronald's stomach pain.  Ronald's pain worsened and he

27  began experiencing further symptoms including nausea, diarrhea, and the inability to digest food

28  properly. Ronald called the VA and Dr. Reddy for follow up appointments to be treated for his

1   pain and discomfort only to be told the wait time for his next appointment would be six, seven or

2   even nine months away.

3           During this time while waiting for an appointment, Ronald's health began to deteriorate

4   because he was unable to properly digest food, hold food down in his digestive system, receive

5   life sustaining nutrients from food, and he began rapidly losing weight. While still waiting for a

6   VA appointment with Dr. Reddy, Ronald began a downhill spiral of losing the ability to care for

7   himself or make decisions.  Ronald's family felt it was necessary to call emergency services for

8   help with Ronald's medical needs.  Paramedics were called to Ronald's home and immediately

9   determined Ronald needed to be taken to the nearest emergency hospital for treatment.

10          Dr. Reddy and the VA fell below the standard of care when this vicious cycle of Ronald

11  waiting for care from the VA only to go into an emergency room hospital occurred four times over

12  a two-year period. Dr. Reddy and VA Staff received Ronald's medical records each time he was

13  admitted at JCL. Dr. Reddy and the VA Staff knew or should have known of Ronald's serious

14  medical condition(s) from the various records and times he was admitted. In addition, JCL staff

15  called the VA to notify them of Ronald's prescription for Vancomycin and Flagyl, JCL provided

16  the VA with Ronald's medical records and diagnoses, and told the VA Ronald was in need of

17  follow up care and treatment. Therefore, Dr. Reddy and VA Staff knew of Ronald's diagnoses of

18  C-diff and pancreatitis.  Dr. Reddy and VA Staff did almost nothing to provide Ronald any help,

19  treatment, medical advice, follow up, or consultation regarding Ronald's diagnosed conditions and

20  this form of non-treatment falls well below the standard of care expected of a doctor and a medical

21  care facility.

22          The standard of care expected is that a doctor would treat, consult, offer follow up care,

23  and eventually cure or manage her patient who is suffering with malnutrition, anemia, severe

24  diarrhea, sepsis and extreme pain.  Dr. Reddy saw Ronald for one brief ten-minute visit after

25  allowing him to wait in the patient waiting room for over four hours. Dr. Reddy allowed him to

26  leave without scheduling any follow up appointment for medical care.   Other than this brief visit,

27  VA Staff, Dr. Reddy, and VA Management failed to schedule Ronald for any timely appointments

28  to see his primary care physician or any physician for that matter during the entire period in which

Ronald suffered from these diagnosed conditions.  Ronald was unable to secure an appointment with Dr. Reddy no matter how many times he called or how hard he tried all the while Dr. Reddy and VA Staff knew or should have known of the seriousness of his medical condition and they did nothing to treat him.

The conduct exemplified by the VA, Dr. Reddy and VA Management was the proximate cause of Ronald's untimely death.  Had Ronald received the appropriate standard of care due to him by Dr. Reddy and the VA Staff, Ronald likely would have lived much longer.  It is entirely reasonable and foreseeable that a patient diagnosed with C-diff and pancreatitis could be treated. C-diff is curable with antibiotics and doctor supervision over the condition, and pancreatitis is entirely manageable under a doctor's care.  Without treatment from Dr. Reddy and the VA, Ronald was not able to control the C-diff. Ronald's inability to eat food caused Ronald to suffer extreme pain, malnutrition, diarrhea and incontinence.  These conditions left untreated ultimately led Ronald to become septic.

Dr. Reddy knew Ronald had become septic after his last admission at JCL.  JCL sent Ronald's medical records directly to Dr. Reddy and called the VA to advise the VA and Dr. Reddy that Ronald seriously needed follow up care.  Ronald had already been admitted to JCL three prior time for basically the same symptoms and diagnoses.  However, this last time, JCL diagnosed Ronald as septic.  The fact that Ronald was septic infers that Ronald needed serious medical attention.  Ronald went to the VA and was seen by Dr. Reddy for ten minutes.  Dr. Reddy was well aware of Ronald's serious condition, yet she still failed to do anything about it other than approve him for prescriptions JCL had already been giving him but that had not stopped the C-diff from causing Ronald to become septic. Dr. Reddy's failure to continue supervised treatment over a septic patient with a life threatening infection and in extreme pain falls well below the standard of care due to a patient in this severe of a medical condition. This vicious cycle of trying to get an appointment only to be denied and then ending up in the emergency room continued for nearly two years and four admissions to JCL costing Ronald over $52,000 and his life. Therefore, Dr. Reddy, the VA Staff and VA Management's deviation from an appropriate standard of care was the proximate cause of Ronald's death.

**C.**      *Res Ipsa Loquitur*

"*Res ipsa loquitur* is 'a rule of circumstantial evidence where the trier of fact is permitted ... to draw an inference of negligence from the happening of an accident of a kind which experience has shown does not normally occur if due care is exercised.'" *Mann v. U.S.* 2012 WL 273690, (2012), *citing*, *Brookover v. Roberts Enterprises, Inc.,* 215 Ariz. 52, 57, 156 P.3d 1157, 1162 (Az.Ct.App.2007) (quoting *McWain v. Tucson Gen. Hosp.,* 137 Ariz. 356, 359, 670 P.2d 1180, 1183 (Az.Ct.App.1983) (citation omitted)). Generally, for *res ipsa loquitur* to be applicable, a plaintiff must show that the accident is of a kind that ordinarily does not occur in the absence of negligence, that the accident was caused by an agency or instrumentality subject to the control of the defendant, and that the plaintiff is not in a position to show the circumstances that caused the agency or instrumentality to operate to its injury. *Id. Citing*, *Brookover,* 215 Ariz. at 57–58, 156 P.3d at 1162–63 (*citing Lowrey v. Montgomery Kone, Inc.,* 202 Ariz. 190, 192, 42 P.3d 621, 623 (Az.Ct.App.2002)). *"Res ipsa loquitur* (meaning the thing speaks for itself) is 'a rule of circumstantial inference of responsibility for an injury.'" *Id. Citing*, *Lowrey,* 202 Ariz. at 192, 42 P.3d at 623 (citation omitted). "A plaintiff who establishes the elements of *res ipsa loquitur* can avoid summary judgment and reach the jury without direct proof of negligence." *Id.* "Whether *res ipsa loquitur* applies is preliminarily a question of law for the court." *Id.*

In this case, Dr. Reddy all but refused to schedule timely and needed appointments for Ronald. Dr. Reddy refused or failed to administer supervision over Ronald's septic infection causing him extreme pain and eventual death. The facts are, Ronald was seen in 2011 for stomach pain and back and leg problems.  This was the VA and Dr. Reddy's initial discovery that Ronald had a stomach condition from which neither Dr. Reddy nor the VA could make a proper diagnosis. Ronald continued to decline in health. Ronald further attempted to make follow up appointments with the VA and Dr. Reddy and was refused appointments, told the only appointments available were as much as nine months into the future, or told there were no appointments available except for a brief phone appointment with Dr. Reddy.  Ronald's health was declining rapidly as he was losing weight, unable to eat or digest food, becoming malnourished, suffering from C-diff, pancreatitis, gastrointestinal problems, severe diarrhea, nausea, and incontinence.  Still the VA and

1   Dr. Reddy refused to timely see Ronald or provide follow up care and treatment after each of his

2   four admissions to JCL hospital.

3        *Res ipsa loquitur* is a rule of circumstantial inference.  It can be inferred under these

4   circumstances that a patient seen once in 2011, desperately in need of medical attention, but who

5   is refused such medical attention would eventually surrender to his illnesses. These facts speak for

6   themselves.  Ronald needed medical care from the VA and Dr. Reddy.  Ronald was refused or was

7   unable to get timely medical care from the VA and Dr. Reddy.  Ronald eventually became septic

8   and so malnourished, he was unable to sustain life and passed away.  These circumstantial facts

9   indicate negligence on behalf of the VA and Dr. Reddy.  The VA and Dr. Reddy owed a duty of

10  care to Ronald to provide medical care and treatment.  The VA and Dr. Reddy failed to provide

11  such care ultimately causing the death of Ronald.  The trier of fact can draw a reasonable inference

12  that if medical care is needed but not received either by refusal or other misconduct, then the

13  defendant must be held accountable and found negligent.

14       In addition, the defendant has openly admitted in media, on its own website, to Congress

15  and others of the negligent conduct of its employees, managers and staff related to the wait lists,

16  secret wait lists, and negligent care of its patients.  The conduct admitted was all for the intention

17  of managers to secure higher merit bonuses by giving the appearance of a level of patient care that

18  was well above the actual care given.  These facts speak for themselves as well.  A reasonable

19  inference can be drawn from these facts in that negligent patient care by the Phoenix VA facility

20  could lead to the death of patients.  In fact, the Phoenix VA has openly admitted to internal

21  investigations that show its negligence may have caused the deaths of up to but not limited to at

22  least forty (40) veterans and maybe as many as three hundred.  Therefore, under the *res ipso*

23  *loquitur* theory, the facts speak for themselves in that the VA's negligent conduct could have

24  resulted in the death of Ronald.

25       Even if the negligent conduct of the VA putting patients on wait lists or secret wait lists

26  doesn't apply to Ronald, the facts still speak for themselves in that Ronald attempted for months

27  if not years to secure an appointment with Dr. Reddy or any doctor available to him.  He could not

28  secure any timely appointment and Dr. Reddy and the VA Staff negligently failed to follow up on

1  his condition(s) even though they knew he was seriously in need of medical treatment.  Therefore,

2  under the doctrine of *res ipsa loquitur*, the VA, Dr. Reddy, VA Staff, and Management are

3  negligent in their treatment of Ronald and ultimately caused his death.

4        **D.     Neglect**

5        Arizona Revised Statutes Section 46-455 provides for the abuse or neglect of patients under

6  medical care through Arizona's Adult Protective Services Act ("APSA").  "The statute applies to

7  any enterprise that is employed to provide care to a vulnerable adult, if that enterprise injures or

8  endangers the vulnerable adult through "neglect, abuse or exploitation." A.R.S. § 46–455(B). *See*

9  *In re Estate of Wyatt*, 235 Ariz. 138, 329 P.3d 1040, 1042 (2014). *See also*; "[A]s relevant here,

10 the APSA provides that "[a] vulnerable adult whose life or health is being or has been endangered

11 or injured by neglect, abuse or exploitation may file an action ... against any person or enterprise

12 that has been employed to provide care, [or] that has assumed a legal duty to provide care." § 46–

13 455(B). Abuse includes "injury caused by negligent acts or omissions." A.R.S. § 46–451(A)(1)(b).

14 *Equihua v. Carondelet Health Network*, 334 P.3d 194, 196 (Ariz. Ct. App. 2014).

15       The term "vulnerable adult" is defined as: "[a]n individual who is over eighteen years of

16 age or older who is unable to protect himself from abuse, neglect or exploitation by others because

17 of a physical or mental impairment. A.R.S. § 46–451(A)(5) and (10). *Davis v. Zlatos*, 211 Ariz.

18 519, 524-25, 123 P.3d 1156, 1161-62 (Ct. App. 2005). Further, "[A] vulnerable person may be

19 able to make … decisions, but is unable to protect [him]self against being abused, neglected or

20 exploited. The protections of the statute extend to a vulnerable adult even if the person is not

21 incapacitated." *Davis v. Zlatos*, 211 Ariz. 519, 525, 123 P.3d 1156, 1162 (Ct. App. 2005). "The

22 first step in our analysis of the statutory definition of "vulnerable adult" is to consider whether

23 [Ronald] suffered from an 'impairment.'" "The APSA does not define "impairment," so we apply

24 the ordinary meaning of the word." *Mid Kansas Fed. Sav. & Loan v. Dynamic Dev. Corp.,* 167

25 Ariz. 122, 128, 804 P.2d 1310, 1316 (1991). "An "impairment" is something that causes a

26 "decrease in strength, value, amount, or quality." Websters II, New College Dictionary 553

27 (Houghton Mifflin Co.2001). "Other definitions have defined impairment in terms of injury,

28 deterioration, or lessening. Webster's Third New International Dictionary 1131 (Unabridged

1   1993); *see also* Oxford English Dictionary (Compact Ed.1971) ("deterioration; injurious lessening

2   or weakening")." *Davis v. Zlatos*, 211 Ariz. 519, 525, 123 P.3d 1156, 1162 (Ct. App. 2005).

3       In this case, Ronald suffered greatly from, among other things, severe stomach pain,

4   diarrhea, nausea, incontinence, malnourishment and the inability to walk during the last two years

5   of his life.  During the last year and a half of his life, Ronald was in such a weakened condition he

6   could not sit, bathe, feed himself, or take care of basic bodily necessities without help.  Ronald

7   received daily help from friends and family to run errands that included, but was not limited to,

8   grocery shopping, cooking his meals, washing his clothes, bathing and cleaning his person as well

9   as his home, and taking Ronald anywhere he needed to go.  It is clear that a lack of adequate

10  medical care by the VA, by its negligent acts or omissions, caused Ronald to suffer a deterioration,

11  lessoning, and injury to his quality of life.  This left him with no way to go outside the home

12  without help, and he was confined to a wheelchair when he was able to sit up.  Therefore, Ronald

13  meets the definition and standard set for a "vulnerable adult."

14      "The next question is whether he was "unable to protect [himself] from abuse, neglect or

15  exploitation by others" because of [his] physical impairment." *Davis v. Zlatos*, 211 Ariz. 519, 526,

16  123 P.3d 1156, 1163 (Ct. App. 2005).  Here, even if Ronald were able to complain about the VA's

17  lack of medical care provided to him, he was unable to gain the attention of anyone at the VA in

18  which to voice his complaints.  However, "[F]ailing to complain is not persuasive evidence that a

19  person is not vulnerable.  Just because an individual does not act to protect [him]self by

20  complaining about abuse, neglect, or exploitation does not mean that person is able to protect

21  [him]self." *Davis v. Zlatos*, 211 Ariz. 519, 526, 123 P.3d 1156, 1163 (Ariz. Ct. App. 2005).

22  Therefore, the fact that Ronald was unable to voice any complaints to anyone at the VA is not a

23  valid argument to suggest Ronald was not a "vulnerable adult."

24      Further, an argument may be made that Ronald could have searched for alternative medical

25  care from sources outside the VA. Ronald was on a fixed income. The VA was his only source of

26  covered medical care expenses. Ronald was admitted four times to JCL hospital incurring medical

27  expenses of over $52,000 which the VA declined to cover.  Ronald was in serious financial

28  distress. Ronald filed bankruptcy in 2012, but was too ill to attend the mandatory hearing causing

1   his case to be dismissed.  Ronald wanted to file bankruptcy again in 2013, but did not get the

2   chance as he passed away before he could re-file.  Seeking alternative medical treatment outside

3   the VA was not possible as Ronald was unable afford medical care outside the VA.  Ronald was

4   only sixty-three years old when he passed away, too young for social security or Medicare services.

5   Ronald's only option was to seek treatment at the VA, or go to emergency room services at the

6   nearest hospital where the emergency room is obligated to provide treatment for an emergency

7   situation. Ronald took the latter option four times over the two-year period he was ill.

8          "To establish a claim for actionable abuse under the APSA, the negligent act or acts alleged

9   "(1) must arise from the relationship of caregiver and recipient, (2) must be closely connected to

10   that relationship, (3) must be linked to the service the caregiver undertook because of the recipient's

11   incapacity, and (4) must be related to the problem or problems that caused the incapacity." *Estate*

12   *of McGill*, 203 Ariz. 525, ¶ 16, 57 P.3d at 389. "In determining whether the APSA applies to a

13   claim of negligence, "[t]he key fact is ... the nature of the act and its connection to the relationship

14   between the caregiver and the recipient." *Estate of Wyatt,* 232 Ariz. 506, ¶ 14, 307 P.3d at 76.

15   *Equihua v. Carondelet Health Network*, 334 P.3d 194, 197 (Ariz. Ct. App. 2014).

16          Here, the VA was required to provide care pursuant to § 46–455(B) while Ronald was its

17   patient by undertaking various medical care and services.  Ronald was seen on several occasions

18   prior to contracting C-diff and pancreatitis for annual checkups, flu shots, his loss of feeling in his

19   legs resulting from the pinched nerves in his back and his initial visit to the VA complaining of

20   stomach pain up to that visit in 2011.  Further, JCL submitted Ronald's medical records to the VA

21   after each and every time he was admitted for treatment.  The VA received the JCL records yet

22   provided no additional medical care to Ronald, which was its responsibility by being his PCP.

23          Dr. Reddy did see Ronald on one occasion for a ten-minute visit at the VA clinic.  Dr.

24   Reddy concurred with JCL's diagnosis of C-diff being present in Ronald's colon and agreed with

25   the treatment of Vancomycin for the C-diff.  The neglect occurred in the subsequent lack of follow

26   up care thereafter.  Dr. Reddy approved Ronald's prescription for Vancomycin, but did nothing

27   more to follow up with Ronald to make sure his C-diff was under control. The C-diff infection

28   eventually caused Ronald to become septic and was the proximate cause of his demise.

1    Ronald required close follow up care from the VA and Dr. Reddy following each and every

2    time he was admitted to JCL to make sure the C-diff was under control and cured, and pain

3    management and treatment for his pancreatitis, malnutrition, urinary retention, systemic

4    inflammatory response syndrome, COPD, esophagitis with gastritis, hyperthyroidism,

5    deconditioning, and sepsis. Therefore, Ronald's neglect arose from the caregiver-recipient

6    relationship and was closely connected to that relationship.

7    Next, the administration of medication for Ronald's C-diff and subsequent lack of follow

8    up care and pain management was not merely linked but was the precise service the VA undertook

9    because Ronald was a vulnerable adult and could not cure the C-diff or treat his pancreatitis and

10   other conditions for which he was diagnosed without follow up care and treatment from the VA.

11   Finally, that service was related to, and necessary because of, the problems that caused Ronald to

12   become a vulnerable adult. Specifically, the extreme weight loss, loss of appetite, inability to eat

13   and receive life sustaining nutrients from food, severe weakness, and incontinence are among the

14   many factors which led to Ronald becoming vulnerable and in need of medical attention. Thus,

15   under the *McGill* test, Ronald has met the necessary factors to maintain an action under the APSA.

16   Further, the case law is clear under the cases cited here and other case law that a hospital

17   is an enterprise as defined under ASPA. There is no argument that the VA can be defined as

18   anything other than Ronald's primary medical caregiver.  As such, the VA undertook the

19   responsibility to care for Ronald's medical needs.  Ronald needed constant and continued medical

20   care to cure his C-diff, treat his pancreatitis and provide either care or treatment for the other

21   medical diagnoses made by JCL.  The VA and Dr. Reddy failed to offer any medical services to

22   Ronald for approximately two years, other than a ten-minute visit with Dr. Reddy.  This ten-minute

23   visit was clearly inadequate to properly diagnose, treat, and cure the list of ailments from which

24   Ronald suffered. The VA knew about these diagnoses because the VA received the medical records

25   from JCL after each time Ronald was discharged from the emergency room.  Therefore, from the

26   facts of this case and the relevant case law, the VA neglected Ronald, a vulnerable adult under the

27   care of the VA and Dr. Reddy, by its acts or omissions in failing to provide him medical care and

28   treatment for his various known diagnoses and this failure ultimately led to his demise and

1  premature death.

2        **E.**      **Wrongful Death**

3        Under the Arizona Revised Statutes, § 12-611, "[W]hen death of a person is caused by a

4  wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not

5  ensued, have entitled the party injured to maintain an action to recover damages in respect thereof,

6  then, and in every such case, the person who or the corporation which would have been liable if

7  death had not ensued shall be liable to an action for damages, notwithstanding the death of the

8  person injured, and although the death was caused under such circumstances as amount in law to

9  murder in the first or second degree or manslaughter."  "The Wrongful Death Act provides as

10  follows: In an action for wrongful death, the jury shall give such damages as it deems fair and just

11  with reference to the injury resulting from the death to the surviving parties who may be entitled

12  to recover…" *Girourd v. Skyline Steel, Inc.*, 158 P.3d 255, 215, 258 Ariz. 126 (Ariz. App., 2007).

13  [Under] "A.R.S. § 12-613, our supreme court has interpreted 'injury resulting from death' to

14  include 'anguish, sorrow, stress, mental suffering, pain and shock' resulting from the death." *Id.*

15  at 215, *see City of Tucson v. Wondergem*, 105 Ariz. 429, 433, 466 P.2d 383, 387 (1970). "…[T]he

16  Wrongful Death Act…permits a recovery not just for the fact of the decedent's death, but also for

17  the manner in which the decedent dies to the extent the manner of death makes the experience

18  more difficult for the survivor. *Id.*

19        In this case, Ronald's son was forced to watch his father live in extreme pain; with severe

20  diarrhea and incontinence as much as eight times per day; Ronald's quick and drastic weight loss

21  to the point Ronald was well under one hundred pounds before each time being admitted to JCL

22  and at the time of his death; and Ronald's inability to eat even though he so desperately wanted to

23  be able to consume any food. Ronald's son watched as his father slowly starved to death while

24  waiting for an appointment with Dr. Reddy or any doctor at the VA.  At the time of his death,

25  Ronald weighed an estimated 85 pounds.

26        Ronald's death was a wrongful act, negligent, and willful in nature.  The VA and Dr. Reddy

27  negligently caused the premature death of Ronald by failing to provide timely care and supervising

28  Ronald's diagnosed conditions. These actions and omissions by the VA and Dr. Reddy were

1    aggravating circumstances because Ronald's death should have been and was preventable. Ronald

2    would likely have been able to be cured of C-diff and the eventual sepsis had he been treated

3    properly by the VA and Dr. Reddy. Ronald would have been able to manage pain from his

4    pancreatitis had he been properly treated by the VA and Dr. Reddy. Ronald would have never

5    become septic, he would have been able to eat and digest food, he would have been able to receive

6    life sustaining nutrients, and he would have lived much longer if not for the VA and Dr. Reddy's

7    negligent conduct. Ronald was suffering from severe pain, diarrhea, and incontinence while

8    waiting for the VA to schedule Ronald for an appointment. Ronald was forced to obtain treatment

9    on four separate occasions from JCL.  JCL sent Ronald's records to the VA and Dr. Reddy each

10   time.  The VA and Dr. Reddy knew Ronald was in serious condition and needed treatment.  The

11   VA and Dr. Reddy did as little as they possibly could to treat Ronald. Ronald's death was a

12   wrongful action that should have and would have been prevented if not for the negligent actions

13   of the VA and Dr. Reddy.

14         Further, the VA carelessly put patients on waiting lists for the purpose of bolstering their

15   potential merit bonuses.  Ronald's attempts to obtain health care from the VA were futile in nature

16   because the VA refused to give him a timely appointment.  He made many calls over a period

17   lasting nearly three years all the while enduring the pain of pancreatitis and the C-diff infection.

18   Ronald was virtually unable to eat food.  When he did eat, the act of consuming food turned into

19   pain and eventually diarrhea and incontinence leading to extreme malnourishment until he died.

20   The VA has no mitigating circumstances leading up to or even explaining their conduct.

21   Therefore, the resulting death of Ronald deems damages are appropriate.

22   **III.    DAMAGES**

23         The standard for calculating damages is a subjective test of the "price" of the decedent's

24   pain during his or her lifetime and the untimeliness of death, leading up to the defendant's tortious

25   conduct is very difficult to discern.    In a recent 2012 case of *Jupiter v. U.S.* WL 6641649 P. 28-

26   29 (E.D. N.Y. 2012), the court was given a similar task and the court held: "Efforts to devise a

27   satisfactory solution to the challenges of putting a price on pain and suffering for tortious injuries

28   have eluded all who have risen to meet it. The usual formulation of the problem is a frank

1   recognition that a monetary award does not achieve the Court's objective of making the injured

2   plaintiff whole. Certainly, in a wrongful death case that is an oxymoron. The objective there is to

3   compensate the estate of the deceased for the pain and suffering he endured during the relevant

4   time that he lived. That compensation is accomplished symbolically in the recognition that pricing

5   pain and suffering is inescapably subjective. The inevitable consequences of subjectivity is

6   disparity — persons enduring what are divined to be a similar degree of pain and suffering, receive

7   different awards. Although the validity of the implied assertion that disparity is unacceptable is

8   debatable, disparity is presumed to be unacceptable per se. The law aims to be fair, evenhanded

9   and predictable. Persons who suffer and experience pain to the same degree should expect to be

10  similarly compensated. Conversely, similarly situated defendants should be burdened by similar

11  judgments. The question one is then led to ask is how are degrees of pain to be measured and

12  compared? Yielding as one must to the unanswerability of that question, courts resort to other

13  cases for guidance." *See, Le., Nairn v. National Railroad Passenger Corp.*, 837 F.2d 565, 568 (2d

14  Cir. 1988); *Consorti v. Armstrong World Industries. Inc.*, 72 F.3d 1003, 1009 (2d Cir. 1995).

15          Further, the court in *Jupiter* went on to hold: "Resorting to other cases for guidance as the

16  Court is advised to do in "pricing" pain and suffering, suggests that the relevant cases would be

17  only those in which the period of the offending endurance was approximately the same. To equate

18  the degree of pain suffered by a decedent with the pain of others discussed in the cases or to pretend

19  to do so would be sophistry. A string citation of cases read in which the duration of the pain and

20  suffering spanned a period of months to approximately three or slightly more years, revealed

21  awards that ranged from roughly one to five million dollars." *Id. at 32*.

22          In *Jupiter*, the patient suffered for over two and a half years from a botched bariatric

23  surgery that caused gastric juices to leak into his abdomen.  He went undiagnosed during the entire

24  time, which the court held that he suffered with, "[T]wo and a half years of progressive debilitation

25  caused by an inexplicably belated diagnosis of gastric leakage, clearly and repeatedly signaled by

26  an inability to tolerate food, inability to eat the food he loved, anorexia, profound weight loss and

27  understandable depression. He was bedridden virtually throughout. He was incontinent…[H]e had

28  what his wife undisputedly described as "stage IV bedsores" which were more "horrific" than

1  anything she had seen in her life…[H]e gradually lost the use of his arms and legs, lost the ability

2  to feed himself and eventually lost the ability to do such simple things as lift a telephone or a TV

3  remote control." *Id. at 31*. The plaintiff in the *Jupiter* case received $5,000,000.00 in damages.

4       Although the actual cause of the negligence can be differentiated from this case, Ronald

5  virtually endured the same symptoms and conditions such as, but not limited to: malnourishment,

6  profound weight loss, and inability to tolerate food, as the patient in *Jupiter*. Ronald also suffered

7  through similar circumstances of medical malpractice, negligence, and wrongful death including

8  the severity and duration of his pain and suffering. However, in this case, the nature of the VA's

9  conduct goes beyond negligence and malpractice.  The VA was willful as the VA purposefully

10  caused the deaths of many veterans including Ronald when it manufactured evidence to "cook the

11  books" by putting patients on wait lists. The fact that Ronald was told each and every time he

12  called for an appointment that the wait time to see Dr. Reddy would be months, if an appointment

13  would be made available at all, was no accident.  It was done intentionally. Further, Dr. Reddy

14  knew Ronald was in dire need of medical treatment and supervision over his diagnosed conditions,

15  and she did little to nothing to follow up, treat, manage, or cure any of Ronald's medical conditions.

16  The Plaintiff was forced to watch Ronald endure nearly three years of pain and suffering. Plaintiff

17  watched as Ronald became malnourished to the point he weighed less than ninety (90) pounds and

18  became so ill he couldn't sit up on his own. Near the end, Ronald was so weak he could not hold

19  a glass of water or get himself out of bed on his own.  Ronald begged the VA and Dr. Reddy's

20  office for help only to be told to go to the nearest emergency room if he needed help.  That was

21  three days before he passed away.  Ronald was a good man, a Veteran of the United States, who

22  deserved much better. Therefore, for the reasons aforementioned, Plaintiff is entitled to the sum of

23  $7,000,000.00 in damages.

24  **IV.**   **CONCLUSION**

25       Ronald's medical treatment from the VA and Dr. Reddy were as follows:

26      1.  Ronald began experiencing pain and related symptoms in 2011.

27

28

2.  Ronald sought out treatment from the VA and Dr. Reddy as the VA and Dr. Reddy were Ronald's primary source of medical care and as his primary care physician respectively.

3.  Ronald was unable to obtain a diagnosis for his stomach pain from the VA or Dr. Reddy.

4.  Ronald received no follow up care or treatment from the VA or Dr. Reddy.

5.  Ronald was forced to go to the emergency room at JCL on four separate occasions because each time he called the VA or Dr. Reddy for an appointment, he was told no appointments were available for up to nine months, or sometimes no appointments were available at all.

6.  Ronald's health continued to decline because he was not properly treated for C-diff and pancreatitis diagnosed by JCL along with the resulting symptoms and diagnosed conditions that follow from these diseases.

7.  Ronald became so malnourished that he could no longer care for himself because he was not properly supervised by the VA or Dr. Reddy to treat, manage and control his diagnoses.

8.  Ronald was seen one time by Dr. Reddy for a ten-minute visit with no further follow up care or treatment by her or the VA in early 2013.

9.  Ronald died because the VA and Dr. Reddy were negligent in their duty to Ronald to provide him medical care and proper treatment.

10.  It was revealed that the VA was putting patients on wait lists so they could "cook the books" to show higher management officials that they were providing timely care to all their patients so the VA managers could receive higher merit bonuses.

11.  It is more likely than not that Ronald was placed on a wait list for months by the VA staff.

12.  It is a fact that the VA knew of Ronald's conditions and diagnoses, but the VA did little to nothing to help a dying man with illnesses that were curable and treatable by a doctor's care and supervision.

13. The VA and Dr. Reddy were negligent in their care for Ronald.

14. Ronald's death was premature and wrongful.

15. Ronald was damaged because he did not receive proper medical care and treatment. It is very likely Ronald would have lived much longer and his family and friends would not have suffered this most tragic and untimely loss.

The conduct of Dr. Reddy, the Management and employees at the Phoenix VA was egregious.  Ronald suffered for more than two years with medical conditions that could have been easily treated if not cured had he been able to see Dr. Reddy or any doctor at the VA and receive treatment.  The VA and Dr. Reddy owed Ronald a duty to treat him in a humanely, responsible and timely manner.  The VA and Dr. Reddy failed to do so and therefore, breached its duty of care to Ronald.  That breach was the actual and proximate cause of his untimely death.  For these reasons, Ronald's estate is entitled to damages in the amount of $7,000,000.00.

WHEREFORE, Plaintiff prays for a judgment in favor of Plaintiff and against Defendant in the amount of $7,000,000.00.

**DATED** this 10th day of November 2015.

By /s/James R. Gaudiosi
    James R. Gaudiosi, Esq.
    Attorney for the Plaintiff